**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A–PLUS ROOFING, INC.; Phyllis Wesson, Respondents.**

No. 90–70015.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1994.

Decided Oct. 28, 1994.

---

William Wachter, Asst. Gen. Counsel and Stanley R. Zirkin, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, DC, for petitioner.

Diane Marie Amann, San Francisco, CA, for respondent.

Before: POOLE, BEEZER and T.G. NELSON, Circuit Judges.

POOLE, Circuit Judge:

This case arises out of years of effort by the NLRB and Roofers' Local Union No. 40 ("the Union") to obtain documents from an employer relevant to the Union's collective bargaining agreement. The failure to produce documents has resulted in civil and criminal contempt proceedings, first against the employer, and later against the employer's secretary, Phyllis Wesson.

We appointed a special master, U.S. Magistrate F. Steele Langford, to conduct the contempt trial, and must now rule on his recommendations. We approve the magistrate's recommendation that the employer, A–Plus Roofing, be held in civil contempt. However, because the magistrate was statutorily barred from assuming jurisdiction over the criminal portion of this case, we cannot rule on his criminal recommendations. Instead, we must start from scratch and refer the matter to a new special master.

I

Respondent A–Plus Roofing is or was a small roofing construction firm.[1] A–Plus was principally owned and operated by Carey Fabiani. At all times relevant, Fabiani's wife, Phyllis Wesson, was the corporate secretary of A–Plus.

On May 20, 1988, John Carnagey, the attorney for Roofers' Local Union No. 40 ("the Union"), mailed a letter to A–Plus, addressed to Fabiani, requesting certified payroll records for nine A–Plus projects in the last two years. The Union requested these documents because it was concerned about A–Plus' compliance with their collective bargaining agreement. Carnagey received no response. He therefore filed an unfair labor practice ("ULP") charge with the NLRB on June 14, 1988, alleging a violation of § 8(a)(5) of the NLRA. See NLRB v. Acme Indus. Co., 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967) (holding that duty

---

1. A–Plus Roofing was not represented by counsel before the special master. Deposition testimony from the company's president, Carey Fabiani, casts some doubt on whether the company is still operating or whether any successors exist. Despite our request for further briefing, the NLRB has been unable to clarify the current status of the company.

to bargain collectively includes duty to furnish information relevant to the collective bargaining agreement). On July 18, Matthew Aronica, attorney for A–Plus, responded to Carnagey's letter by providing a list of hours for 20 employees. Carnagey considered this response inadequate, and the NLRB proceedings went forward. No further compliance with the request was forthcoming.

In November, a hearing was held before an administrative law judge, and on February 8, the ALJ issued a decision and order finding that A–Plus had committed a ULP. The ALJ ordered A–Plus to produce the requested documents.

When no compliance was forthcoming, the NLRB issued a July 11, 1989 order and decision, adopting the ALJ's decision in its entirety. Following this order, Carnagey again wrote A–Plus, to the attention of Phyllis Wesson, first on July 19, and then on October 30, attaching his original May 20 request and demanding production of documents. Neither A–Plus nor Wesson responded.

The NLRB next sought enforcement of its order, and this court issued an order enforcing the NLRB's order on July 12, 1990. The order was directed to A–Plus and its officers, and reiterated the remedies the ALJ had first ordered seventeen months earlier.

Meanwhile, on February 16, 1989, pursuant to a search warrant, the California Employment Development Department ("EDD") had seized 17 boxes of business documents from A–Plus' offices. EDD seized these documents pursuant to an investigation into failure to pay employment taxes. Over the next two years, Wesson and A–Plus had some access to these documents, though the parties disagree vigorously over just how much.

NLRB Acting Compliance Officer John O'Hearn contacted A–Plus' attorney Aronica in September, 1990, seeking compliance with the Ninth Circuit's order. Aronica replied that he would "consult with [his] client" and subsequently submitted a declaration, purportedly signed by Wesson as corporate secretary, explaining that document production had not been forthcoming because efforts to produce them had been "exasperated" by EDD's possession of all documents.

In April 1991, having failed to obtain compliance, the NLRB petitioned the Ninth Circuit to hold A–Plus in civil contempt. A–Plus filed a response, verified by corporate secretary Phyllis Wesson, stating as an affirmative defense the fact that EDD had relevant documents but had not responded to requests for production. On June 27, a panel of this court referred the matter to F. Steele Langford, Chief Magistrate for the Northern District of California, for selection of a magistrate to serve as special master. The special master was to address pretrial matters, hold evidentiary hearings regarding the civil contempt motion, and then submit a report to the Ninth Circuit. Langford selected himself.

After further investigation revealed that A–Plus might have had access to the requested documents throughout the previous three years, and that Phyllis Wesson had on numerous occasions allegedly represented otherwise, the NLRB sought to add criminal contempt charges against both A–Plus and Wesson. On January 8, 1992, a panel of this court, by a 2–1 vote, referred the criminal contempt charge to Langford under the same terms as the original June 27 order.

Langford appointed counsel for Wesson and consolidated the two proceedings. He also appointed two NLRB attorneys, Stanley Zirkin and Joan Sullivan, to prosecute. On the day the trial was to begin, Wesson produced numerous documents which allegedly had been found over the weekend, and brought a motion to dismiss based on substantial compliance. This motion was denied, and three days of hearings were held. The special master then filed recommendations with this court, recommending that both A–Plus and Wesson be found in contempt.

Wesson raises a host of objections to the magistrate's recommendations. Most of these we need not consider, because a few are dispositive. We agree with Wesson both that her contempt prosecution was never properly authorized, and that the magistrate to whom we referred her case lacked jurisdiction to try her. Accordingly, we strike the magistrate's criminal contempt recommendations, initiate contempt proceedings, and refer this case to the Northern District

of California for hearing before a properly selected special master. We also enter civil contempt sanctions against A–Plus.

## II

### A

The validity of the magistrate's criminal jurisdiction in this case hinges on the construction of two statutes, 28 U.S.C. § 636 and 18 U.S.C. § 3401. Section 636, the general jurisdictional statute for federal magistrates, provides in pertinent part:

(a) Each United States magistrate serving under this chapter shall have within the territorial jurisdiction prescribed by his appointment—

.   .   .   .   .

(3) the power to conduct trials under section 3401, title 18, United States Code, in conformity with and subject to the limitations of that section

.   .   .   .   .

(b) . . .

.   .   .   .   .

(3) A magistrate may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.

■ The NLRB contends that jurisdiction was proper under the § 636(b)(3) catchall provision. It argues that because the ultimate decision will still be made by an Article III judge, the referral to the magistrate was necessarily lawful. In support of this reasoning, the Board relies on *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), which upheld the constitutionality of another part of § 636(b). The Court in *Raddatz* concluded that a magistrate could constitutionally preside over a suppression hearing and make recommendations because the authority to make the final determination remained with an Article III judge. *Id.* at 681–84, 100 S.Ct. at 2415–16. Similarly, here the magistrate served only as a factfinder, while the ultimate decision rests with us.

■ At most, however, *Raddatz* arguably compels the conclusion that our referral was constitutional. But federal magistrates are creatures of statute, and so is their jurisdiction. We cannot augment it; we cannot

ask them to do something Congress has not authorized them to do. We need not and must not reach the constitutional question if we can first determine that the magistrate had no statutorily-created jurisdiction to handle the referral we gave it. As to that question, *Raddatz* is silent.

■ While the NLRB would have us find jurisdiction under § 636(b)(3), both the statute and precedent dictate otherwise. Our search for meaning must begin with the language of the statute itself. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). We note that § 636(a)(3) expressly addresses the issue of magistrates' criminal trial jurisdiction, subject to certain conditions. It is a well-settled canon of statutory interpretation that specific provisions prevail over general provisions. *Markair, Inc. v. CAB*, 744 F.2d 1383, 1385 (9th Cir.1984). It is an equally well-settled canon that "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). If we read the § 636(b)(3) catchall section as including those criminal trials that § 636(a)(3) excludes, we nullify § 636(a)(3)'s exclusions and violate each of these canons. *Cf. Peretz v. United States*, 501 U.S. 923, 955, 111 S.Ct. 2661, 2679, 115 L.Ed.2d 808 (1991) (Scalia, J. dissenting) ("By specifically authorizing magistrates to perform duties in civil and misdemeanor trials, and specifying the manner in which parties were to express their consent in those situations, [28 U.S.C. § 636] suggested *absence* of authority to preside over felony trials through some (unspecified) mode of consent. The canon of *ejusdem generis* keeps the 'additional duties' clause from swallowing up the rest of the statute.").

■ Moreover, the Supreme Court's interpretation of § 636(b)(3) establishes the presence or absence of consent as the most important factor in determining what the section encompasses. In 1989, the Court had concluded that voir dire in a felony trial was not covered by § 636(b)(3). *Gomez v. United States*, 490 U.S. 858, 872–76, 109 S.Ct. 2237, 2246–48, 104 L.Ed.2d 923 (1989). Two years later, it amended this conclusion, holding that

so long as the defendant consented, a magistrate could conduct voir dire in a felony case under § 636(b)(3). *Peretz,* 501 U.S. at 935–36, 111 S.Ct. at 2668–69. As the Court repeatedly made clear in *Peretz,* consent by the parties is crucial to the construction of § 636(b)(3). Where consent is lacking, courts should be reluctant "to construe the additional duties clause to include responsibilities of far greater importance than the specified duties assigned to magistrates.... [T]he duties that a magistrate may perform over the parties' objections are generally subsidiary matters." *Id.* at 933, 111 S.Ct. at 2667. *Peretz* contrasted such subsidiary matters with the far more extensive sorts of proceedings that may be conducted with consent, including jury selection and misdemeanor trials. *Id.*

In this case, there is no dispute that Phyllis Wesson never consented to trial before a magistrate. The conduct of trial is no subsidiary matter; it is the most central and fundamental part of the process a criminal defendant receives. Even if § 636(b)(3) might authorize trial with consent, it cannot be stretched to authorize trial without consent. *Cf. Roberts v. Manson,* 876 F.2d 670, 674 (8th Cir.1989) (holding that § 636(b)(3) does not extend to grant jurisdiction over nonconsensual civil evidentiary hearings). Therefore, § 636(b)(3) does not confer jurisdiction over the referral in this case.

■ On the other hand, § 636(a)(3) expressly addresses magisterial criminal trial jurisdiction, and in our view it is this provision which actually governs the case. Section 636(a)(3) grants magistrates the power to conduct misdemeanor trials, and requires that all such trials be conducted in accordance with 18 U.S.C. § 3401. That section includes the requirement that express written consent be obtained from any defendant:

> (b) Any person charged with a misdemeanor may elect, however, to be tried before a judge of the district court for the district in which the offense was committed. The magistrate shall carefully explain to the defendant that he has a right to *trial, judgment, and sentencing* by a judge of the district court.... The magistrate shall not proceed to try the case unless the defendant, after such explanation, files a written consent that specifically waives tri-

al, judgment, and sentencing by a judge of the district court.

18 U.S.C. § 3401(b) (emphasis added). This section expressly distinguishes between trial and judgment and assures a right to *trial* by a district judge unless consent is given. Thus, the consent requirement extends even to magistrate trials where judgment is rendered by the district court or some other Article III judge. Such is the situation in our case. Even though it is we who would render judgment and, if necessary, sentence Wesson, that involvement does not cure the fact that the trial itself was conducted by a magistrate without Wesson's consent. We hold that 28 U.S.C. § 636 does not grant United States magistrates the power to conduct such nonconsensual criminal trials.

Our holding is consistent with decisions of both the Third and Eleventh Circuits. Each circuit has allowed magistrates to try criminal contempt cases, so long as the penalties involved make them misdemeanors and the defendants consent pursuant to 18 U.S.C. § 3401(b). *United States v. Gedraitis,* 690 F.2d 351, 354–55 (3d Cir.1982); *Midway Mfg. Co. v. Kruckenberg,* 720 F.2d 653, 653 (11th Cir.1983). In contrast, in *Taberer v. Armstrong World Indus., Inc.,* 954 F.2d 888 (3d Cir.1992), a magistrate performed a function identical to that in this case, holding a criminal contempt evidentiary hearing and then passing on his findings to the district court for review and ultimate disposition. *Id.* at 893–94. The Third Circuit reversed the defendant's conviction because the requirements of 18 U.S.C. § 3401(b) were not met. *Id.* at 907–08.

■ In short, although our referral did not grant to the magistrate the power to enter judgment, we did permit him to conduct a criminal trial. However, a "magistrate's criminal trial jurisdiction depends on the defendant's specific, written consent." *Peretz,* 501 U.S. at 931, 111 S.Ct. at 2667 (quoting *Gomez,* 490 U.S. at 870–71, 109 S.Ct. at 2245). No specific, written consent was obtained. Therefore, the magistrate had no jurisdiction, and we cannot rule based on his recommendations.

This construction of the Federal Magistrates Act applies equally to the criminal trial

of A–Plus. A–Plus never gave written consent, so no jurisdiction existed as to the criminal contempt charge. Accordingly, we cannot consider the special master's recommendations on this charge, either.

### B

■ In contrast, we find no defect in the magistrate's civil contempt jurisdiction. Magistrates may be used as special masters in civil matters. 28 U.S.C. § 636(b)(2). Absent consent, their use is restricted by, inter alia, the requirements of Federal Rule of Civil Procedure 53. *See id.* Under that rule, references in actions to be tried without a jury will be permitted only upon a showing of an "exceptional condition." Fed.R.Civ.P. 53(b). However, appellate courts, unlike the district courts, are unequipped to handle trials and must make use of special masters to cope with original jurisdiction cases such as this one. *Cf. Raddatz,* 447 U.S. at 683 n. 11, 100 S.Ct. at 2416 n. 11. We believe this permanent, structural disability qualifies as an exceptional condition. Consequently, our use of a magistrate as a special master in the civil case comports with both the Federal Magistrates Act and Federal Rule of Civil Procedure 53.

### III

■ Jurisdiction is not the only difficulty here. The magisterial proceedings were infected by a second fundamental flaw, because we improperly delegated prosecutorial power to the magistrate. Wesson suggests that this delegation deprived her of due process. We need not reach the due process question, however, because we conclude that the referral was not authorized by statute.

The language of this Court's second referral order leaves the decision to initiate criminal contempt proceedings against Wesson in the hands of a United States magistrate:

> The request [to initiate criminal contempt proceedings] is referred to the special master, in his capacity as United States magistrate, for disposition.
> If the master grants the request ...

1/8/92 Order at 2. The conditional language makes it clear that the motions panel which handled the matter was not itself deciding to initiate contempt proceedings.

Admittedly, the magistrate did not view this language as granting him any discretion. In an order issued the next day, he did not address whether the request should be granted, but simply consolidated the civil and criminal actions. The magistrate's order refers simply to "[t]he Board's request for criminal contempt." 1/9/92 Order at 1. However, this does not change this court's January 8 order into a directive to try Wesson; at best, it means that neither this court *nor* Magistrate Langford ever reached a reasoned decision to prosecute Wesson.

Our open-ended referral violated the Federal Magistrates Act. No express authority exists for a magistrate to decide whether to try someone for contempt. 28 U.S.C. § 636 gives magistrates jurisdiction over most pretrial matters, but none of its enumerated duties at all resemble the quasiprosecutorial decision to initiate criminal contempt proceedings. Nor can the § 636(b)(3) catchall provision authorize such a decision, for "[w]hen a statute creates an office to which it assigns specific duties, those duties outline the attributes of the office. Any additional duties performed pursuant to a general authorizing in the statute reasonably should bear some relation to the specified duties." *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989).

■ Judges and grand juries may initiate criminal contempt proceedings. *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 797–800, 107 S.Ct. 2124, 2132–34, 95 L.Ed.2d 740 (1987) (judges); *United States v. Armstrong,* 781 F.2d 700, 704 (9th Cir.1986) (grand juries). The NLRB has cited no case, and we have found none, authorizing delegation of the prosecutorial decision to parties other than these. We hold that the decision to initiate criminal contempt proceedings may not be delegated to a federal magistrate. Because this court's January 8, 1992 order failed to make the decision to prosecute, no party with the authority to initiate prosecution ever did so.

This failure is a second, independent reason why we cannot consider the special master's criminal contempt recommendations. It also means that for this case to continue, we

must decide anew whether a prosecution for criminal contempt is warranted.

## IV

■ Before deciding whether to initiate proceedings, we must address another of Wesson's challenges to her hearing before the magistrate. Wesson contends that the magistrate erred in refusing to dismiss the contempt charge against her when, on the morning of the first day of the proceedings, she produced documents covered in the May 20, 1988 document request and subsequent Ninth Circuit order. Because of the other flaws in the magisterial proceeding, we need not address whether Magistrate Langford should have dismissed the contempt charges. We must decide instead whether Wesson's alleged compliance bars our initiation of new contempt proceedings.

Wesson's argument rests on three propositions. In her view, 1) the October 1992 production constituted substantial compliance with our order, 2) substantial compliance is sufficient to purge civil contempt, and 3) since courts must, under the "least possible power rule," consider civil before criminal contempt, the purging of civil contempt eliminated the need for any sanction and requires dismissal of the criminal contempt charge.

■ The record before us does not allow an accurate assessment of the degree of Wesson's compliance. It appears that some required documents were produced while others were not, all at the last minute. We have little reason to be "much impressed by gunpoint compliance." *United States v. Greyhound Corp.,* 508 F.2d 529, 540 (7th Cir.1974).

■ However, we assume without deciding that the October document production constituted substantial compliance. In that case, Wesson's second contention, that substantial compliance purges civil contempt, is correct. *See General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986).

■ It is also true that the least possible power rule places some limits on the seeking of contempt sanctions. A court's exercise of the criminal contempt power "must be restrained by the principle that 'only "[t]he least possible power adequate to the end proposed" should be used in con-

tempt cases.'" *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 801, 107 S.Ct. 2124, 2134, 95 L.Ed.2d 740 (1987) (quoting *United States v. Wilson,* 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975) (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821))); *accord United States v. Flynt,* 756 F.2d 1352, 1363 (9th Cir.1985).

■ However, Wesson misconstrues the effect of this rule. Wesson suggests that *Shillitani v. United States,* 384 U.S. 364, 371 n. 9, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966) requires civil contempt to be considered first in all cases. This Circuit has already expressly rejected that argument. *See United States v. Armstrong,* 781 F.2d 700, 703 (9th Cir.1986). The least power principle does not require that a court consider civil contempt before criminal contempt in all cases, only in those cases where it is attempting to coerce future behavior. When instead the end is punishment of past behavior, criminal contempt can be appropriate without civil contempt being considered first. *Id.* at 703–06.

In this instance, criminal contempt was requested in order to punish Wesson for alleged longstanding willful disobedience of this court's order. Initially, only civil charges against A–Plus were filed; but upon discovery of numerous apparent misrepresentations by Wesson about access to ordered documents, the NLRB decided to seek criminal contempt sanctions. It is punishment of this conduct which is the end of these contempt proceedings. In light of this punitive end, civil sanctions would be ineffective. In short, if any prior willful misconduct can be shown, Wesson's belated presumed substantial compliance does not excuse it. *See United States v. Darwin Constr. Co.,* 873 F.2d 750, 753 (4th Cir.1989). Consequently, the October production of documents does not bar further proceedings.

## V

■ We must still decide whether to initiate criminal contempt proceedings. Wesson's document production does not bar prosecution. Nor does double jeopardy, because neither Wesson nor A–Plus have been put in

jeopardy. Jeopardy does not attach unless the court conducting a trial had jurisdiction. *Grafton v. United States,* 206 U.S. 333, 345, 27 S.Ct. 749, 751, 51 L.Ed. 1084 (1907); *United States v. Ball,* 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896).

▮ Under the circumstances, we believe prosecution is appropriate. If true, the NLRB's allegations show a pattern of not just weeks or months but years of contumacy. We cannot let such disregard for our orders go unnoticed.

▮ Further proceedings will require a special master. In theory, a magistrate could still be used if Wesson consented. We think the simpler and better course is to follow the approach used by the Second Circuit in *United States v. Charmer Industries* and appoint a district judge as special master. *See United States v. Charmer Indus., Inc.,* 722 F.2d 1073, 1076 (2d Cir.1983) (designating district court judge as special master to hold hearing and make recommendations regarding alleged criminal contempt of court of appeals' order). Accordingly, we will refer this matter to the Northern District of California and request that the chief judge designate a district court judge to serve as special master.

▮ The resolution of the civil contempt charges is easier. There is no dispute that A–Plus Roofing is in civil contempt; A–Plus made no appearance before the magistrate and is in default. Full compliance still has not occurred. The NLRB has requested future compliance, the posting of notices, and a fine of $10,000 plus $500 per day for future violations. The NLRB has also requested fines of $1,000 plus $200 per day for each corporate officer who, with notice of this court's order, further impedes compliance. Given the years of noncompliance involved, we view this sanction as appropriate. *Cf. United States v. Darwin Constr. Co.,* 873 F.2d 750 (4th Cir.1989) (affirming a $5,000 per day fine for failure to produce documents).

## VI

▮ Because this case is being referred for further proceedings, we consider it appropriate to address one additional procedural matter which will be at issue. Phyllis Wesson contends that the special master erred in appointing NLRB attorneys Sullivan and Zirkin to prosecute this case because they were insufficiently disinterested in the matter. However, her arguments misapply our law. In future proceedings, the special master may appoint Sullivan and Zirkin to prosecute the contempt charges. In reaching this conclusion, we express no opinion about whether she should do so. We reach the issue only to make clear that the option is available.

▮ As a general matter, attorneys for private parties who benefit from a court order may not be appointed to prosecute contempt actions based on violations of that order. *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 809, 107 S.Ct. 2124, 2138, 95 L.Ed.2d 740 (1987). Such a rule is necessary to avoid not just impropriety, but the appearance of impropriety. *Id.* at 806, 107 S.Ct. at 2137.

▮ However, an equally broad prohibition does not apply to the appointment of public agency attorneys as prosecutors. *See FTC v. American Nat'l Cellular,* 868 F.2d 315, 319–20 (9th Cir.1989). In determining whether appointment of public agency attorneys is consistent with *Young*'s principles, courts should weigh two considerations. First, how involved in the prosecution has the U.S. Attorney's office been? *Id.* at 320. Second, how involved have the specific attorneys appointed as prosecutors been in the litigation giving rise to the underlying order? *Id.*

In this case, the NLRB consulted with the U.S. Attorney's office regarding prosecution of the contempt, and the U.S. Attorney's office concurred in having NLRB attorneys prosecute the case. Sullivan and Zirkin were sworn in as special assistant U.S. attorneys. This is comparable to the degree of involvement found sufficient in *American National Cellular. Id.* Moreover, as in *American National Cellular,* Sullivan and Zirkin had no involvement in the litigation that gave rise to the original NLRB and 9th Circuit orders.

## 1420

*Id.* Where Wesson errs is in misconstruing this second prong, interpreting it to inquire into the involvement of the agency as a whole in the preceding litigation. To the contrary, *American National Cellular* clearly focuses on the involvement of the individual attorneys. *See id.* Under these circumstances, there is no appearance of impropriety, and the decision to allow Sullivan and Zirkin to prosecute the contempt case is permissible.

In so holding, we emphasize again that we intimate no opinion about whether Sullivan or Zirkin should be appointed as prosecutors by the new special master. We hold only that they can be.

### VII

This court erred twice in referring this criminal contempt case to a special master. First, it failed to affirmatively elect to initiate charges. Second, it referred them to a magistrate who lacked the jurisdiction to try them. As a result, the criminal contempt case must be retried. We therefore refer this matter to the chief judge of the Northern District Court of California with directions to appoint a district judge to serve as special master.

No such defects infect the civil contempt case against A–Plus, and we adopt the NLRB's suggested remedies as set forth more fully in a separate concurrently-filed order.

PETITION GRANTED IN PART AND REFERRED IN PART.