Elena MARK and Paul Gustafson,
Plaintiffs,

v.

VALLEY INSURANCE COMPANY
and Valley Property and
Casualty, Defendants.

No. CV 01–1575–BR.

United States District Court,
D. Oregon.

July 17, 2003.

N. Robert Stoll, Steve D. Larson, David F. Rees, Stoll Stoll Berne Lokting & Schlacter P.C., Portland, OR, Charles A. Ringo, Beaverton, OR, for Plaintiffs.

Douglas G. Houser, Loren D. Podwill, Bullivant Houser Bailey P.C., Portland, OR, for Defendants.

## OPINION AND ORDER

BROWN, District Judge.

The following is a redacted version of the Court's Opinion and Order (# 135) is-

sued under seal on July 10, 2003. The redacted form of the Opinion and Order omits factual material of a proprietary and confidential nature. The legal analysis has not been redacted.

This matter comes before the Court on Defendant Valley Insurance Company's Motion for Summary Judgment (# 59) as to the claims of Plaintiff Paul Gustafson and all others similarly situated.

On June 18, 2002, Plaintiffs Elena Mark and Paul Gustafson filed their Second Amended Complaint alleging Defendants Valley Insurance Company and Valley Property and Casualty violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, when they took adverse actions with respect to the underwriting of the automobile insurance policies of Plaintiffs and others similarly situated on the basis of information contained in their consumer credit reports and then failed to notify them of those adverse actions.

On January 10, 2003, Defendants filed their Motions for Summary Judgment. During oral argument heard on May 21, 2003, the Court denied Valley Property's Motion for Summary Judgment as to the claims of Mark and all others similarly situated to the extent Valley Property contended no reasonable juror could conclude Valley Property failed to institute reasonable procedures to ensure FCRA compliance or willfully violated FCRA. The Court also denied Defendants' Motions to the extent Defendants argued they were enti-

tled to judgment as a matter of law because they complied with FCRA's notice requirements when they mailed notices to Plaintiffs several months after they allegedly took the adverse actions.

The Court took under advisement Valley Insurance's Motion for Summary Judgment as to the claim of Gustafson and all others similarly situated to the extent Valley Insurance argued it had no duty to provide notice to Gustafson or other insureds like him because it did not take an adverse action against them. The Court also took under advisement Valley Insurance's Motion for Summary Judgment as to the claims of Gustafson and all others similarly situated to the extent Valley Insurance contended no reasonable juror could conclude Valley Insurance willfully failed to comply with its obligations under FCRA.[1]

For the following reasons, the Court **GRANTS** Valley Insurance's Motion for Summary Judgment as to the FCRA claims of Gustafson and all others similarly situated and, therefore, **DISMISSES with prejudice** those claims against Valley Insurance.

### FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted:

**A. Valley Insurance's FCRA Procedures for New Business Customers**

During 1999, some of Defendants' employees went to a conference presented by

---

1. In a single paragraph in their Reply Memorandum, Defendants raise for the first time several constitutional arguments regarding Plaintiffs' damages claims. Although the Court gave Defendants leave to file two supplemental memoranda and heard oral argument on this matter, Defendants did not discuss these constitutional arguments again. Because Defendants failed to raise these

grounds properly in their Motions for Summary Judgment or the original Memorandum in Support of their Motions and failed to brief these arguments adequately, the Court, in the exercise of its discretion, declines to consider these untimely arguments. Accordingly, the Court denies Defendants' Motions to the extent they are based on these grounds.

Fair, Isaac and Company, a company in the business of providing statistically-based decision support tools. The topic of the conference was the correlation between poor credit history and increased likelihood of claims. After Defendants reviewed Fair Isaac's information, they looked at their own books of business and found the same correlation.

In July 1999, Valley Insurance began using a Household Financial Stability factor to rate and to set the premiums it charged for automobile insurance policies. Because Valley Insurance was not in operation before this time, all of Valley Insurance's customers were "new business customers" whom Valley Insurance did not insure previously.

Pursuant to Valley Insurance's program, when a potential insured requested a quote on automobile insurance, one of Valley Insurance's agents first determined the customer's Household Financial Stability factor by contacting ChoicePoint Services, Inc., a company that compiles and maintains databases of information regarding consumers. ChoicePoint then provided Valley Insurance with a national credit file report. The national credit file report contained the Fair Isaac Casualty Loss Score, a numerical score that was calculated by applying an analytical model that predicts the likelihood of future claims based on certain information in a consumer's credit history. The Fair Isaac Casualty Loss Score model analyzed the comprehensive information available in the potential insured's credit report and then synthesized it into a single numerical score ranging

from approximately 300 to 900. Individuals with higher scores were less likely to produce a loss or a claims file than individuals with lower scores.

Valley Insurance's computer system automatically converted the Fair Isaac Casualty Loss Score into one of four insurance scores: Significantly Above Average (750 + ), Above Average (675–749), Average (575–674), and Below Average (Below 575).[2] Valley Insurance then used the new insured's insurance score in conjunction with the insured driver's age and driving activity to determine the insured's premium tier rating and insurance premium. Valley Insurance's automobile insurance program consisted of four premium tiers or levels: Ultra, Preferred, Standard, and Non–Standard. Each of the four insurance scores corresponded to one of the premium rates:

| | | |
|---|---|---|
| Significantly above average | = | Ultra Rate |
| Above average | = | Preferred Rate |
| Average | = | Standard Rate |
| Below Average | = | Non–Standard Rate |

To qualify for Valley Insurance's optimal rate, the Ultra Rate, an insured had to meet the following requirements: 1) be over age 21, 2) have an incident-free driving record during the three prior years, and 3) have a Significantly Above Average insurance score. Thus, an insured with a Significantly Above Average insurance score did not necessarily qualify for Valley Insurance's best rate available, the Ultra Rate. An insured, however, could not qualify for Valley Insurance's best rate available unless the insured had a Significantly Above Average insurance score.

Valley Insurance considered the Standard Rate to be its baseline rate. The

---

**2.** It is unclear from the record whether Valley Insurance uses a fifth insurance score: Significantly Below Average. Some of Valley Insurance's documentation indicates a person with a Significantly Below Average insurance score is not eligible for any coverage. Other documents, however, indicate the Below Average and Significantly Below Average tiers, in fact, constitute a single tier.

Non–Standard Rate was [REDACTED] higher than the Standard rate [REDACTED]. The Preferred Rate was [REDACTED] less than the Standard Rate. The Ultra Rate was [REDACTED] less than the Standard Rate [REDACTED]. In other words, an insured whose credit, age, and activity scores resulted in his placement in the Non–Standard tier paid nearly twice as much for his car insurance as an Ultra customer. Moreover, an insured with a Below Average insurance score paid almost twice as much for insurance as a similarly-situated insured with a Significantly Above Average insurance score.

## B. Gustafson's Policy

On July 24, 2001, Valley Insurance issued an automobile insurance policy to Gustafson. Valley Insurance rated Gustafson's insurance score as Average. As a result, Valley Insurance charged Gustafson its Standard Rate, which was a higher insurance premium than it would have charged him if his insurance score had been rated Above Average or Significantly Above Average. In fact, if Gustafson's insurance score had been Significantly Above Average, his annual premium would have been [REDACTED] less than Valley Insurance charged him.

Valley Insurance did not provide Gustafson with a FCRA adverse action notice when it issued his policy. Valley Insurance, however, sent Gustafson a FCRA notice in January 2001, which was approximately six months after his insurance policy became effective and three months after Mark originally filed this action against Valley Property.

## STANDARDS

### A. Summary Judgment Standards

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir.2002). In response to a properly-supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id.*

An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir.1990). When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir.1998) (citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001).

### B. Statutory Construction Standards

When a district court interprets a federal statute, it must apply a two-part analy-

sis. "The first and most important step in construing a statute is the statutory language itself." *Royal Foods Co. v. RJR Holdings, Inc.*, 252 F.3d 1102, 1106 (9th Cir.2001) (citing *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The court must look to the text of the statute to " 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). "The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Accordingly, it is a " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' " *Id.* (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). A court, therefore, must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Id.* (internal quotations and citations omitted).

If congressional intent is clear from the plain meaning of the statute, the court need not look further for guidance. *Id.* If a statute is unambiguous on its face, "there is ordinarily no reason to resort to legislative history to illuminate the language." *State of Cal. Dep't of Soc. Servs. v. Thompson*, 321 F.3d 835, 853 (9th Cir. 2003). Courts look at legislative history when the plain language is unambiguous only if "the legislative history clearly indicates that Congress meant something other than what it said." *Carson Harbor*

*Village Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir.2001), *cert. dismissed*, 535 U.S. 971, 122 S.Ct. 1437, 152 L.Ed.2d 381 (2002) (quoting *In re Catapult Entertainment, Inc.*, 165 F.3d 747, 753 (9th Cir.), *cert. dism'd*, 528 U.S. 924, 120 S.Ct. 369, 145 L.Ed.2d 248 (1999)). When the language of the statute is not dispositive, however, the courts look to the congressional intent revealed in the legislative history and "purposes of the statutory scheme." *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir.), *cert. denied*, 535 U.S. 1105, 122 S.Ct. 2314, 152 L.Ed.2d 1067 (2002).

In addition, if the statute is ambiguous as to the question at issue, the court must determine whether an agency interpretation of the statutory provision exists and is owed some degree of deference. *Brown & Williamson*, 529 U.S. at 132, 120 S.Ct. 1291. When Congress expressly delegates authority or responsibility to an agency to implement a particular provision or to fill a particular gap in a statute, any ensuing regulation is binding on the courts unless it is procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). When it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law," a reviewing court must accept the agency's interpretation as long as it is reasonable. *Id.* at 2172. The court, however, generally owes this degree of deference, commonly referred to as *Chevron* deference, only to formal agency interpretations such as those that follow notice-and-comment rulemakings or formal adju-

dications. *Id.* (*Chevron* deference is warranted only if the agency interpretation follows a "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). *Id.* Nonetheless, the "well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' " even if they do not have the force of law and are not entitled to *Chevron* deference. *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139–40, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). Such an agency interpretation is entitled to "a respect proportional to its 'power to persuade.' " *Mead,* 533 U.S. at 218, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161).

## DISCUSSION

## I. Adverse Action

Congress enacted FCRA for the stated purpose of requiring credit reporting agencies to adopt "reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). Although FCRA generally regulates credit reporting agencies, it also creates obligations for certain users of consumer credit information. In particular, 15 U.S.C. § 1681m(a) provides: "[I]f a person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report," the person shall provide "notice of the adverse action to the consumer."

FCRA defines "adverse action" as follows:

The term "adverse action" -

(A) has the same meaning as in section 1691(d)(6)[3] of this title; and

(B) means -

 (i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance.

 (ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

 (iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 1681b(a)(3)(D) of this title; and

 (iv) an action taken or determination that is

**3.** 15 U.S.C. § 1691(d)(6) is part of the Equal Credit Opportunity Act (ECOA). That section provides:

[T]he term 'adverse action' means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

(I) made in connection with an application the was made by, or a transaction that was initiated by, any consumer, or in connection with a review of an account under section 1681b(a)(3)(F)(ii) of this title; and

(II) adverse to the interests of the consumer.

15 U.S.C. § 1681a(k)(1).

Valley Insurance argues it had no obligation to provide a FCRA notice to Gustafson because it did not take an "adverse action" with respect to the underwriting of his automobile insurance policy when it charged him more than the optimal rate based on information contained in his consumer credit report. Valley Insurance contends setting the initial premium rate for a new customer cannot constitute an increase in the charge for insurance. Gustafson, on the other hand, contends an insurer takes adverse action against a new applicant if the insurer "quotes and/or offers" to the potential insured a premium rate that is less than optimal or that is higher than the rate offered to similarly-situated customers with better credit histories.

## A. Precedent

Congress added § 1681a(k) to FCRA when it passed the Consumer Credit Reporting Reform Act of 1996. As a result, few courts have had the opportunity to interpret FCRA's adverse action provision. The parties have not cited and the Court has been unable to find any controlling authority regarding the proper interpretation of FCRA's adverse action definition in § 1681a(k)(1). Gustafson, however, urges the Court to adopt the reasoning of the District Court for the Southern District of Ohio in *Mick v. Level Propane Gases, Inc.,*

No. 98–CV–959, 1999 WL 33453772 (S.D.Ohio, Sept. 29, 1999), and to conclude an adverse action occurs whenever a potential insured is offered terms, including premium rates, less favorable than those offered to or currently enjoyed by other insureds.

In *Mick,* the court overruled the defendant's objection to class certification based on a lack of numerosity. The court concluded the class was larger than the defendant contended because the class "may include" those persons who were charged a higher price than other customers. The court, however, did not actually decide the issue and instead explicitly stated one of the common issues of law to be decided by the court at a later date was whether charging a customer more than the best possible rate constitutes an adverse action under FCRA. Accordingly, this Court does not find the court's conclusion in *Mick* to be helpful. In the absence of any controlling or persuasive authority, the Court is faced with an issue of first impression. The Court, therefore, must apply the traditional principles of statutory construction to determine whether Valley Insurance's conduct constituted an adverse action that obligated Valley Insurance to provide a FCRA adverse action notice to Plaintiff Gustafson and others similarly situated.

## B. Plain Meaning

As noted, "[t]he first and most important step in construing a statute is the statutory language itself." *Royal Foods,* 252 F.3d at 1106. If the statute has a plain and unambiguous meaning, the court generally need look no further for guidance. *Id.*

 Each party contends the plain meaning of § 1681a(k)(1) supports its posi-

tion. The parties, however, dispute which subsection of § 1681a(k)(1) applies to Valley Insurance's actions with respect to the pricing of Gustafson's insurance policy.

Valley Insurance argues § 1681a(k)(1)(A) applies here. Subsection (A) provides adverse action has the same meaning as in § 1691(d)(6) of ECOA. As noted, ECOA defines adverse action as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested."

■ The Court finds § 1681a(k)(1)(A) plainly does not govern Gustafson's claim against Valley Insurance. That statutory provision, by its own terms, applies to credit transactions rather than insurance transactions. Moreover, § 1681a(k)(1)(B)(i) provides a definition of adverse action that specifically applies to decisions made "in connection with the underwriting of insurance." Because FCRA's adverse action statute contains an insurance-specific definition, the Court concludes the alternate credit-specific definition is not applicable to a decision made in the insurance context.

Although Gustafson acknowledges § 1681a(k)(1)(B)(i) provides an insurance-specific definition of adverse action, he contends the definition that governs the facts of this matter is the more general "catchall" definition contained in § 1681a(k)(1)(B)(iv). The catchall provision provides a general definition of adverse action that applies on its face to any decisions made in connection with any transaction initiated or application made by a consumer.

"It is a well-settled canon of statutory interpretation that specific provisions pre-vail over general provisions." *Nat'l Labor Relations Bd. v. A–Plus Roofing, Inc.,* 39 F.3d 1410, 1415 (9th Cir.1994). "It is an equally well-settled canon of statutory interpretation that 'in construing a statute we are obliged to give effect, if possible, to every word Congress used.'" *Id.* (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)). A court, therefore, must not read a catchall section so broadly as to swallow up the more specific sections of a statute or to render them superfluous. *Id. See also United States v. Colacurcio,* 84 F.3d 326, 333 (9th Cir.1996).

Applying these standards, the Court notes the insurance-specific provision in § 1681a(k)(1)(B)(i) explicitly applies to both existing insurance policies and to applications for insurance. If the Court were to adopt Gustafson's definition of adverse action, however, the more general language in the catchall provision of subsection (B)(iv)' would subsume the insurance-specific provision with respect to all applications for insurance as well as any consumer-initiated insurance transactions involving existing policies. To give meaning to all of the words used by Congress, including its reference to applications for insurance in § 1681a(k)(1)(B)(i), the Court cannot read the catchall provision so broadly that it encompasses activities clearly falling under the auspices of the insurance-specific provision. The Court, therefore, concludes the insurance-specific provision of subsection (B)(i) rather than the general catchall provision of subsection (B)(iv) applies in the insurance context and governs Gustafson's claim against Valley Insurance.

■ Pursuant to § 1681a(k)(1)(B)(i), an adverse action means only one of four things: a denial of coverage, a cancellation

of coverage, an increase in any charge for insurance, and an adverse or unfavorable change in the terms or amount of insurance coverage. By using the verb "means," Congress indicated this list is exclusive, and no other actions constitute adverse actions in the insurance context.

Gustafson, nonetheless, argues Valley Insurance's conduct constituted an increase in the charge for his insurance. Gustafson contends § 1681a(k)(1)(B)(i) plainly means an insurer increases the charge for insurance if it charges one of its insured more than another insured based on information in a consumer credit report.

FCRA does not define the term "increase." The plain and ordinary meaning of the verb "to increase" is to make something greater or larger.[4] *Merriam–Webster's Collegiate Dictionary* 589 (10th ed.1998). The "something" that is increased in the statute is the "charge for any insurance." The plain and common meaning of the noun "charge" is "the price demanded for something." *Id.* at 192. Thus, the statute plainly means an insurer takes adverse action if the insurer makes greater (i.e., larger) the price demanded for insurance.

An insurer cannot "make greater" something that did not exist previously. The statutory definition of adverse action, therefore, clearly anticipates an insurer must have made an initial charge or demand for payment before the insurer can increase that charge. In other words, an insurer cannot increase the charge for insurance unless the insurer previously set and demanded payment of the premium

for that insured's insurance coverage at a lower price.

Gustafson argues Valley Insurance increased the charge for his insurance because it charged him a rate that was higher than the best possible rate available to persons with Significantly Above Average insurance scores. The Court finds Gustafson's interpretation of the statute stretches the meaning of "charge" too far. The fact that a rate exists does not constitute a charge or demand for payment. Although an insurer's optimal rate may exist in a vacuum if no customer is asked to pay or does pay that rate, the ordinary meaning of "charge" requires an actual demand to an insured for the price of insurance coverage. Thus, an increase in the price demanded of an insured ordinarily and plainly means an increase in the price previously demanded of that insured rather than a rate that could be issued to a hypothetical customer.

Moreover, the Court finds Gustafson's interpretation of the phrase "increase in any charge" would require the Court to read into the statute words that Congress did not include and is contrary to the plain meaning of the language Congress chose to employ. The statute does not refer to the insurer's "optimal" or "best possible" rate available to similarly-situated persons nor, in fact, does it mention the insurer's "standard" or "basic" rate. If the Court were to agree with Gustafson and conclude § 1681a(k)(1)(B)(i) requires the Court to compare an insured's premium rate to the rates charged to other hypothetical customers when determining whether an insurer has increased the insured's charge for insurance, any of these various rates

---

**4.** FCRA's notice requirements are triggered when an insurer "takes" an adverse action. Thus, although § 1681a(k)(1)(B)(i) uses the term "increase" as a noun, it is logical to treat "increase" as an active verb also.

could serve as a potential comparison point. The Court, however, finds it would be improper to read these comparison points into § 1681a(k)(1)(B)(i) absent a specific reference by Congress.

Nonetheless, Gustafson argues Valley Insurance took an adverse action and "increased" the price demanded from him for his car insurance when it applied a "multiplier" to its Standard Rate to calculate Gustafson's premium rate as part of its initial underwriting process. First, the Court notes Valley Insurance applied a multiplier [REDACTED] in this case and, therefore, charged Gustafson only its Standard Rate. In other words, Valley Insurance did not "make greater" Gustafson's premium rate when it applied its multiplier because Gustafson's rate was the Standard Rate before and after the multiplier was applied.

More importantly, the Court finds Valley Insurance's application of an internal formula cannot constitute a "charge" as that term ordinarily is understood. The Court finds the application of the formula is merely the process by which Valley Insurance calculates a charge or demand for payment and is not a charge itself. Valley Insurance did not quote or offer insurance to Gustafson at one price and then raise that price after it reviewed his credit report. Gustafson received a single bill, and Valley Insurance issued a single charge to him.

Based on the foregoing, the Court finds the common and ordinary meaning of § 1681a(k)(1)(B)(i) is that an insurer takes an adverse action when it "makes greater," i.e., "increases," the price previously demanded of the insured for insurance. The Court also finds § 1681a(k)(1)(B)(i) reasonably cannot be read to mean an insurer takes adverse action if it initially

charges an insured more than its optimal rate based on information in the insured's consumer credit report. The Court, therefore, concludes the statute unambiguously means an insurer does not increase a charge for insurance unless the insurer charges an insured one price for insurance and then subsequently increases that charge based on information in the insured's consumer credit report. Accordingly, the Court concludes Valley Insurance did not increase the charge for Gustafson's car insurance because it issued a single charge for that insurance coverage.

## C. Legislative History

As noted, if the plain meaning of a statute is unambiguous, the Court need look no further for guidance as to the interpretation of the statute. *Brown & Williamson*, 529 U.S. at 132, 120 S.Ct. 1291. The Court is obligated to look beyond the statutory language if the legislative history of the provision "clearly indicates that Congress meant something other than what it said." *See Thompson*, 321 F.3d at 853.

Gustafson argues the Court must consider the legislative history because the Court's literal interpretation of the statutory language would produce a result contrary to the intent of Congress. Gustafson urges the Court to consider various House and Senate Reports that preceded Congress's enactment of the Consumer Credit Reporting Reform Act of 1996, Pub.L. No. 104–208 (1996), which added the adverse action definition contained in § 1681a(k)(1). In particular, Gustafson refers the Court to H.R.Rep. No. 102–692, S.Rep. No. 103–209, and H.R.Rep. No. 103–486. The legislative reports on which Gustafson relies, however, were associated with previous versions of the amend-

ments.[5] Each of the prior versions of the bill defined adverse action more broadly to "include" specifically enumerated actions; i.e., the prior versions of the bill did not limit adverse actions to those enumerated actions. As noted, Congress actually enacted a more restrictive definition of adverse action in that the statute defines adverse action to "mean" only the actions that are listed in § 1681a(k)(1). As a result, the Court concludes the legislative history relied on by Gustafson does not indicate clearly that Congress meant something other than the plain meaning of the statutory language in § 1681a(k)(1) or that the Court's literal interpretation of that plain meaning is contrary to Congressional intent.

### D. FTC Interpretations

█ Again, the Court need not defer to an agency interpretation that is contrary to the plain meaning of an unambiguous statute. *Brown & Williamson,* 529 U.S. at 132, 120 S.Ct. 1291. In any event, the Court does not owe *Chevron* deference to informal agency decisions. *Mead,* 533 U.S. at 227, 121 S.Ct. 2164. An informal agency interpretation deserves from the Court only the degree of respect that the underlying analysis demands. *Id.*

Gustafson has not identified any FTC regulations or FTC decisions following formal adjudications that address the meaning of adverse action pursuant to § 1681a(k)(1). Gustafson instead refers the Court to various guidelines issued by the FTC and an informal opinion letter written by a staff attorney that specifically provided it was not binding on the FTC itself. Although Gustafson acknowledges

this Court does not owe *Chevron* deference to the agency interpretations in any of these documents even if the Court determines § 1681a(k)(1) is ambiguous, Gustafson, nonetheless, argues these informal interpretations of the adverse action definition are entitled to a certain degree of respect.

As noted, agency interpretations that are clearly contrary to the plain meaning of the statute are not entitled to any degree of deference. To the extent the FTC has interpreted FCRA to require insurers to provide FCRA adverse action notice to an insured when it issues an initial charge to the insured that is higher than the charge demanded of similarly-situated insureds with better credit histories, the Court finds the FTC's interpretation is contrary to the plain meaning of the statute. Moreover, the FTC staff attorney who drafted the informal opinion letter on which Gustafson relies based her conclusions on the legislative history of the FCRA amendments that contained language much broader language of the amendments actually adopted.

Based on the foregoing, the Court concludes the FTC's informal interpretations of § 1681a(k)(1) are not entitled to any degree of deference or respect, and those interpretations do not change the Court's plain meaning analysis of the statute.

### E. Conclusion

Based on the foregoing, the Court concludes § 1681a(k)(1) is unambiguous and plainly. means an insurer does not "increase any charge for insurance" and, therefore, does not take any adverse action against an insured when the insurer merely issues a single, initial charge to an insured. The Court further concludes an insurer cannot increase a charge for insur-

---

**5.** H.R.Rep. No. 102–692 accompanied H.R. 3596, Sen. R. No. 103–209 accompanied S. 783, and H.R.Rep. No. 103–486 accompanied H.R. 1015.

ance unless the insurer makes an initial demand for payment to the insured and subsequently increases the amount of that demand. Although Valley Insurance charged Gustafson a higher premium than it would have charged him if his credit history had been better, the undisputed evidence establishes Valley Insurance issued only a single charge to Gustafson. Gustafson, therefore, has failed to raise a genuine issue of fact regarding whether Valley Insurance took an adverse action with respect to the underwriting of Gustafson's insurance. Accordingly, the Court grants Valley Insurance's Motion for Summary Judgment as to the claim of Gustafson and all others similarly situated and dismisses with prejudice those claims against Valley Insurance.

## II. Willfulness

Valley Insurance also moves for summary judgment on the ground that Gustafson has failed to provide sufficient evidence for a reasonable juror to conclude Valley Insurance willfully violated FCRA. Because the Court has granted summary judgment to Valley Insurance as to the claims of Gustafson and all others similarly situated on the ground that Valley Insurance did not violate FCRA, the Court denies as moot Valley Insurance's Motion to the extent it is based on Gustafson's failure to show willfulness.

### CONCLUSION

For these reasons, the Court **GRANTS** Valley Insurance's Motion for Summary Judgment (# 59) as to the claim of Gustafson and all others similarly situated and, therefore, **DISMISSES with prejudice** those claims against Valley Insurance.

IT IS SO ORDERED.